**Ronald Dale WINDSOR, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 24373.**

United States Court of Appeals
Fifth Circuit.

Jan. 31, 1968.

**531**

Karl Leib, Jr., Miami, Fla., for appellant.

Michael J. Osman, Theodore Klein, Asst. U. S. Attys., Miami, Fla., for appellee.

Before GEWIN, BELL and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

In this criminal case the question for decision is whether the circumstances required the giving of the *Miranda* warnings by Government agents to safeguard defendant's Fifth Amendment privilege against self-incrimination by the presence of counsel during interrogation, before obtaining an oral and later a written incriminating statement from defendant. Both confessions were received in evidence at the trial, over appellant's objection, and he was convicted of transporting a stolen motor vehicle in interstate commerce (18 U.S.C. § 2312).[1]

On June 14, 1966—one day after the Supreme Court announced its decision in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) —appellant and his companion, Robert Carroll Sharp, were stopped in an automobile by the Bal Harbour, Florida, police for a traffic violation. Sharp, who was driving, was unable to post the $50 bond required of nonresident traffic violators and was taken to jail. When he failed to prove ownership of the vehicle, the local police contacted the FBI. That evening two agents of the FBI interviewed Sharp in jail about the vehicle, and according to their testimony, Sharp said that during the latter part of May 1966 he was working at the Olympus Hotel in Tacoma, Washington, with the defendant, Windsor, and a girl named Arlene Stephens; further, Sharp said that Miss Stephens had rented a car from a car rental agency and asked him and Windsor to take the car back to the agency for her, which they did, but they informed the agency that the car was defective and that Miss Stephens wanted another car; and finally that on this false representation the agency furnished him and Windsor with a 1965 Plymouth,

---

1. Robert Carroll Sharp, a co-defendant, was jointly tried with appellant Windsor, but found not guilty by the jury.

and shortly thereafter they left the State of Washington together in the vehicle and eventually drove to Miami. The agents testified that Sharp admitted that he knew the car was obtained under false pretenses and that it was stolen, and further said that he and the defendant, Windsor, drove the car to Miami.

Sharp gave the Government agents the key to his motel room at the Alda Motel which he told the agents he shared with defendant Windsor, and the agents immediately went to the motel the same night to search it. Agent Hufford testified that when the agents arrived at the motel they first talked in the lobby with two persons by the name of Roth and Morgan for background information, and attempted to determine if they knew anything about the car. The agents asked to talk with them in their motel room and upon entering the room they saw a gun which they seized to make sure it could not be used against them. The agents asked whose gun it was and Windsor, who was in the room, identified himself and said the gun was his. The agents then told Windsor they had the key to his motel room to look for Sharp's draft card, and asked him if he would go with them. He agreed and accompanied the agents to the room. Agent Hufford testified that he and his fellow agent identified themselves and informed Windsor he was not under arrest and was not being detained in any way and was not to construe this as being detained; that he did not have to make a statement; that any statement he did make could be used against him in a court of law; and that he could speak to an attorney or anyone else before he said anything at all; that he could terminate the interview at any time. He was also advised that in the event he was arrested an attorney would be appointed for him by the court.

According to the agents' testimony, appellant Windsor acknowledged that he understood their warnings and then, in response to their questions, gave them an oral statement admitting that Miss

Stephens had rented a car which he and Sharp had returned to the agency and secured a 1965 Plymouth in its place; that they knew the car had been obtained under false pretenses; and that when it was driven across the state line it was stolen. Whereupon Agent Hufford said he left the room, telephoned the United States Attorney and obtained authority to prosecute Windsor. He returned to the room, arrested appellant and brought him to jail.

The following day the Government agents presented to appellant—then in custody—a prepared written statement in the handwriting of Agent Hufford, of the incriminating information they had obtained from him the night before in his motel room. They requested that he write a paragraph at the end of the statement, which appellant did at their dictation, as follows:

"I have read this three page statement & state it is true & complete to the best of my Nolage [sic] I have initaled [sic] the other to [sic] pages, all corrections, & I signed this below."

He then signed the statement at their request. No warning or explanation of any kind of appellant's constitutional rights, of his right to remain silent, that any statement he made could be used as evidence against him, and of his right to the presence of counsel during interrogation, was given at this interview.

The written statement opens with the following preamble:

"I, Ronald Dale Windsor, make the following free and voluntary statement to J. P. Hufford who had identified himself to me as a Special Agent of the FBI. SA Hufford also advised me I did not have to make a statement and any statement I did make could be used against me in court. He further advised me I could speak with an attorney or anyone else before saying anything at all. No force, threats, or promises of benefit were used to get me to make this statement and I under-

stand I can have an attorney appointed for me if I am arrested."[2]

Appellant contends that the Government agents failed to advise him that he had the right to have an attorney, retained or appointed, present during the initial interrogation when he gave the incriminating oral statement at his motel or later when he signed the written incriminating statement. He contends that though he was not held in formal custody when interrogated in the motel room, his arrest was certainly contemplated, Sharp having implicated both himself and Windsor, and that the full *Miranda* warnings should have been given prior to any interview in which a confession or admission of guilt was sought from the suspect. Appellant seeks a reversal of his conviction and a new trial on the ground that the incriminating statements were inadmissible as evidence against him for failure to give the full *Miranda* warnings.

In Miranda v. State of Arizona, 384 U. S. 436, 478, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966), the Supreme Court said:

"* * * we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will

be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him."

■ It is obvious that the full *Miranda* warnings were not given to appellant at any time prior to obtaining either the oral or written confession because Windsor was not informed by the Government agents that he was entitled to the *presence* of an attorney, retained or appointed, during the interrogations. The question is whether the circumstances required it and whether the facts of the case make the principles of *Miranda* applicable. The written confession was signed after Windsor wrote the final paragraph in his own handwriting, at the dictation of the FBI agents. There is no question that Windsor was then in custody and deprived of his freedom. Failure to give the full *Miranda* warnings at that time was undoubtedly a violation of the prohibition against taking a confession from a defendant while in police custody without first informing him that he is entitled to the presence of counsel, retained or appointed. Merely telling him that he could speak with an attorney or anyone else before he said anything at all is not the same as informing him that he is entitled to the presence of an attorney during interrogation and that one will be appointed if he cannot afford one. The obvious purpose of the agents interrogating him was to elicit an incriminating statement for "the investi-

**2.** A pertinent incriminating paragraph of the written statement by appellant reads as follows:

"Sharp and I both drove the car from Washington to Miami. I realized the

car was stolen and I was aware I was driving a stolen motor vehicle across state lines. I realize I was breaking the law."

gation was no longer a general inquiry into an unsolved crime," but had begun "to focus on a particular suspect," namely, Windsor. See Escobedo v. State of Illinois, 378 U.S. 478, 490, 491, 84 S.Ct. 1758, 1765, 12 L.Ed.2d 977 (1964).

Obtaining the oral confession was under different circumstances. Appellant had been informed by the agents that he was not under arrest before being interrogated in his motel room. Nevertheless, the Government agents already knew from Windsor's companion and codefendant, Sharp, all of the circumstances pertaining to the transportation of the vehicle by Sharp and Windsor from Tacoma to Miami. The focus of the investigation was clearly and unmistakably upon Windsor while he was being interrogated. In effect he was already being detained and in custody or being deprived of his freedom in a significant way. As soon as he made his incriminating oral statement, Agent Hufford left the room, telephoned the United States Attorney and obtained authority to place him under arrest. Sharp had already given the

agents sufficient evidence for them to conclude that Windsor was also involved in the interstate transportation of the stolen car. There was, therefore, probable cause to arrest him. The Government agents' testimony that Windsor was not a suspect and not under arrest when questioned in his motel room is belied by the facts of the case. We cannot permit the *Miranda* principles to be so easily frustrated. Windsor was definitely the central figure in their investigation and should have been first informed of his right to the presence of counsel, retained or appointed, during the initial interrogation, as well as later when requested to sign the written confession while in jail. See Miranda v. State of Arizona, supra;[3] Escobedo v. State of Illinois, supra.[4] See also Sobel (Nathan R. Sobel, Justice of the Supreme Court, Kings County, New York), The New Confession Standards "Miranda v. Arizona" (1966, Gould Publications), pp. 60–63.[5]

Since this case developed one day after *Miranda* was decided by the Supreme Court, it is apparent that the Gov-

---

**3.** See also Kamisar, A Dissent From the Miranda Dissents: Some Comments on the "New" Fifth Amendment and the Old "Voluntariness" Test, 65 Mich.L.Rev. 59 (1966); A New Look at Confessions: Escobedo—The Second Round, Institute of Continuing Legal Education (1967); Graham, What Is "Custodial Interrogation?": California's Anticipatory Application of Miranda v. Arizona, 14 UCLA L.Rev. 59 (1966).

**4.** Evans v. United States, 5 Cir., 1967, 377 F.2d 535, is not apposite. The Court held in that case that *Miranda* was inapplicable because the defendant was not in custody or deprived of her freedom in any way. It is noted, however, that according to the testimony of the FBI agents (denied by appellant), she was given the full *Miranda* warning, including advice that she had the right to have an attorney present during the FBI interrogation. No such warning was ever given to Windsor. There is no indication in the opinion that the agents had proceeded beyond the investigatory to the accusatory stage.

**5.** Several excerpts from Justice Sobel's treatise are pertinent here; for example, the author states (p. 60):

"A person 'detained' by the police in the field may not be 'free to go.' If only 'formal arrest' constituted 'custody' the police could frustrate *Miranda's* protective devices by 'detaining' and thus delaying formal arrest."

\* \* \* \* \* \* \*

"The prime inquiry is into the existence of probable cause. If indeed the police officer had probable cause to arrest, his protestations that the person detained was 'free to go' must be ignored. It must be presumed that a police officer will do his duty; if he has probable cause, he will arrest. The existence of probable cause establishes 'custody.' Any other rule would permit the frustration of Miranda's commands." (Id. at 61.)

\* \* \* \* \* \* \*

"As a practical proposition, interrogation may be found 'non-custodial' only when it is perfectly evident that the police were clearly investigating to determine whether a crime had been committed or who had committed it. The basic inquiry is 'Were the police merely seeking information from the person detained or had suspicion sufficiently focused to establish an intent to detain?'" (Id. at 62).

ernment agents had not yet been briefed on its effect and, therefore, had not given the full warning to appellant required by that decision.

Reversed and remanded for a new trial.